## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## FLORENCE DIVISION

MARY L. SPIRES,         )    C/A NO.: 4:04-22898-HFF-TER
                           )
         Plaintiff,     )
                           )    REPORT AND RECOMMENDATION
vs.                  )
                           )
JO ANNE B. BARNHART,   )
Commissioner of Social Security, )
                           )
         Defendant.   )
_____)

      This is an action brought pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. Section 405(g), to obtain judicial review of a "final decision" of the Commissioner of Social Security, denying plaintiff's claim for Disability Insurance Benefits. The only issues before the Court are whether the findings of fact are supported by substantial evidence and whether proper legal standards have been applied. This case was referred to the undersigned for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), (D.S.C.).

## I.  PROCEDURAL HISTORY

      The plaintiff, Mary L. Spires, filed applications for Disability Insurance Benefits (DIB) on March 2, 1999, and October 10, 2000, alleging inability to work since December 17, 1998 (Tr. 79, 240-243), due to unsuccessful back surgery, lumbar spine impairment and severe back pain (Tr. 253).  Her applications were denied at all administrative levels (Tr. 8-10), and upon reconsideration (Tr. 72).  Plaintiff filed a request for hearing on March 10, 2000 (Tr. 76).  Following a hearing held on March 6, 2003, William F. Pope, the Administrative Law Judge (ALJ),  issued a decision denying

plaintiff's claim (Tr. 33-65). As the Appeal's Council denied plaintiff's request for review (Tr. 8-10), the ALJ's decision dated October 20, 2003, (Tr. 15-28) became the Commissioner's final decision for purposes of judicial review under 42 U.S.C. § 405(g).  See 20 C.F.R. § 404.981.

On May 10, 2005, plaintiff filed a motion for judgment on the pleadings under Fed. R. Civ. P.12(c) with her memorandum of law support of the motion. On May 25, 2005, the Commissioner requested that the Court not rule on the motion until she could consider and respond to it as an integral part of her analysis of plaintiff's arguments in this memorandum.  See D.S.C. Local Rule 83.VII.05.

## II.  FACTUAL BACKGROUND

Plaintiff was born January 6, 1954, and was 49 years old on the date of the ALJ's decision of October 20, 2003. She has a high school education and past work experience as a teacher's assistant (Tr. 139, 254).

## III.  DISABILITY ANALYSIS

The plaintiff's arguments consist of the following:

(1)     The Commissioner's decision that plaintiff suffers no legally severe mental impairment both lacks the support of substantial evidence and is based on legal error.

(2)     The ALJ erred in failing to evaluate the side effects of plaintiff's prescribed medication in assessing her residual functional capacity.

(Memorandum).

In the decision of October 20, 2003, the ALJ found  the following:

1.     The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth

2

in Section 216(I) of the Social Security Act and is insured for benefits through September 30, 2004.

2.  The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.  The claimant has had an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(b) and 416.920(b).

4.  These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.  The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.  The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR §§ 404.1527 and 416.927).

7.  The claimant has the residual functional capacity to perform work with restrictions which require no lifting or carrying over 20 pounds occasionally or 10 pounds frequently; no pushing or pulling over 20 pounds; no standing and/or walking over 6 hours in an 8-hour day; limited stooping, twisting, crouching, kneeling and climbing of stairs or ramps; no balancing or climbing of ladders or scaffolds; no foot pedals other controls with either lower extremity; and avoidance of hazards such as unprotected heights, vibration and dangerous machinery.

8.  The claimant is unable to perform any of her past relevant work (20 CFR §§ 404.1565 and 416.965).

9.  The claimant is a "younger individual" (20 CFR §§ 404.1563 and 416.963).

10.  The claimant has a high school education (20 CFR §§ 404.1564 and 416.964).

11.  The claimant's acquired skills from her past relevant work that are transferable to other work within her residual functional capacity include record keeping and report writing.

12.    The claimant has the residual functional capacity to perform a significant range of light work (20 CFR §§ 404.1567 and 416.967).

13.    Although the claimant's nonexertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rules 202.22 and 202.20 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include light, semi-skilled work as a file/records clerk, and light, unskilled work as an interviewer, sales/counter clerk, and shipping and receiving clerk.

14.    The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(f) and 416.920(f)).

(Tr. 27-28).

The Commissioner argues that the ALJ's decision was based on substantial evidence and that the phrase "substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 390-401, (1971). Under the Social Security Act, 42 U.S.C. § 405 (g), the scope of review of the Commissioner's final decision is limited to: (1) whether the decision of the Commissioner is supported by substantial evidence and (2) whether the legal conclusions of the Commissioner are correct under controlling law. Myers v. Califano, 611 F.2d 980, 982-83 (4th Cir. 1988); Richardson v. Califano, 574 F.2d 802 (4th Cir. 1978). "Substantial evidence" is that evidence which a "reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 390. Such evidence is generally equated with the amount of evidence necessary to avoid a directed verdict. Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984). The Court's scope of review is specific and narrow. It does not conduct a de novo review of the evidence, and the Commissioner's finding of non-disability is to be

4

upheld, even if the Court disagrees, so long as it is supported by substantial evidence.   42 U.S.C. § 405 (g) (1982); Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

The general procedure of a Social Security disability inquiry is well established.   Five questions are to be asked sequentially during the course of a disability determination.   20 C.F.R. §§ 404.1520, 1520a (1988).   An ALJ must consider (1) whether the claimant is engaged in substantial gainful activity, (2) whether the claimant has a severe impairment, (3) whether the claimant has an impairment which equals a condition contained within the Social Security Administration's official listing of impairments (at 20 C.F.R. Pt. 404, Subpart P, App. 1), (4) whether the claimant has an impairment which prevents past relevant work and (5) whether the claimant's impairments prevent him from any substantial gainful employment.

Under 42 U.S.C. §§ 423 (d)(1)(A) and 423(d)(5) pursuant to the Regulations formulated by the Commissioner, the plaintiff has the burden of proving disability, which is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   See 20 C.F.R. § 404.1505(a); Blalock, 483 F.2d at 775.

If an individual is found not disabled at any step, further inquiry is unnecessary.   20 C.F.R. § 404.1503(a).   Hall v. Harris, 658 F.2d 260 (4th Cir. 1981).   An ALJ's factual determinations must be upheld if supported by substantial evidence and proper legal standards were applied.   Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986).

A claimant is not disabled within the meaning of the Act if she can return to her past relevant work as it is customarily performed in the economy or as the claimant actually performed the work.

5

SSR 82-62.  The claimant bears the burden of establishing her inability to work within the meaning of the Social Security Act.  42 U.S.C. § 423 (d)(5).  She must make a prima facie showing of disability by showing she was unable to return to her past relevant work.  Grant v. Schweiker, 699 F. 2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to her past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy.  The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert.  Id. at 191.

## IV. MEDICAL REPORTS

The undersigned has reviewed the medical records and finds many of the reports relevant to the issues in this case.[1]

Plaintiff injured her back after falling on the job as a teacher's aide in April of 1998 (Tr. 38-39, 136).  After the accident, plaintiff continued her normal activities, but noted progressive limitations in her ability to walk, bend, stoop, and twist (Tr. 142).  Plaintiff tried to return to work the following fall, but her symptoms worsened, and she eventually stopped working on September 25, 1998, and couldn't walk significantly thereafter (Tr. 142).

On December 9, 1998, plaintiff was diagnosed by Scott B. Boyd, M.D., with severe focal

---

[1] As the medical records set forth by defendant has not been seriously disputed by plaintiff, the undisputed medical evidence as stated by the defendant is set forth herein, in part.

lumbar stenosis with likely mechanical instability at her L4-5 level. Dr. Boyd recommended decompressive surgery (Tr. 166).

On December 29, 1998, plaintiff was admitted to Lexington Medical Center and underwent a decompressive lumbar laminectomy surgery with medial facetectomy at L4 and L5, which she tolerated well, and successfully decompressed the canal and nerve roots (Tr. 127-128).

A lumbar MRI dated January 16, 1999, showed post-surgical changes from lumbar laminectomy and facetectomy resulting in dramatic improvement in her focal stenosis with no neural compressive lesions or epidural fibrosis. On January 26, 1999, lumbar spine x-rays showed normal vertebral body alignment, and no signs of unusual instability or acute spine pathology. (Tr. 134-135, 286-289, 409-410).

On February 4, 1999, plaintiff complained to Dr. Boyd of back pain, and radiating pain into her legs and feet feeling as though she was no better. On examination, plaintiff had stuttering lower extremity weakness and depressed ankle jerks. (Tr. 163). Dr. Boyd referred her for a myelogram which was performed on February 9, 1999, indicating adequate decompression of the L4 disc; no significant canal stenosis; a broad based disc bulge with mild fattening of the thecal sac at L4-5 but no significant encroachment; mild neural foraminal narrowing; and mild L4-5 facet arthropathy. (Tr. 132). On February 11, 1999, plaintiff reported that she continued to do poorly. Dr.Boyd confirmed that her myelogram showed no pathology and, other films show no evidence of instability.(Tr. 163). Dr. Boyd referred plaintiff to J. Talley Parrott, M.D., for evaluation (Tr. 162).

On March 3, 1999, Dr. Parrott found "abundant evidence of psychogenic magnification or pain behavior with tenderness to light touch in her lower back," lower back pain with pelvic rotation, lower extremity stammering weakness and inability to perform bilateral active straight leg raising,

7

"unrealistic" restriction of lumbar and hip flexion with forward bending, and no other neurological deficits. Dr. Parrott recommended comprehensive pain management, and opined that further surgical intervention would not be beneficial to plaintiff (Tr. 136-137).

On March 23, 1999, plaintiff presented to Matthew E. Midcap, M.D., for low back and bilateral leg pain. Dr. Midcap observed normal speech and thought, and found full upper extremity ranges of motion, lower extremity pain with straight leg raising, normal upper and lower extremity motor and sensory examination, 1-2+ knee and ankle reflexes, and on positive Waddell finding. He assessed lumbar radiculopathy and post laminectomy syndrome, pain-related depression, and prescribed Elavil, an anti-depressant, and a lumbar epidural steroid injection (Tr. 139-140).

On May 26, 1999, plaintiff returned to Dr. Midcap for a followup visit. Dr. Midcap observed that plaintiff still had a very stiff, and somewhat antalgic, trunk gait; 5/5 Waddell findings; pain with rotation; and normal lower extremity motor and sensory examinations. Dr. Midcap prescribed Elavil and Ultram, an analgesic; and recommended participation in a full pain program (Tr. 138).

On July 6, 1999, plaintiff presented to orthopaedist William L. Lehman, M.D. for examination. Dr. Lehman found that plaintiff had difficulty moving from the sitting to standing position, considerable right antalgic gait with walking, and positive straight leg raising tests. However, he also found reciprocal heel to toe gait, unsteady yet transiently sustainable heel and toe walk, and the absence of spasticity or pathologic reflexes, atrophy, gross weakness, or abnormal alignment. Dr. Lehman opined that although plaintiff's operative results were poor, the reason for these results was still unclear, and operative exploration or possible fusion might explain plaintiff's symptoms (Tr. 142-145).

On August 25, 1999, plaintiff returned to Dr. Boyd after having "an awful time with her

8

back." Dr. Boyd noted imaging studies that showed adequate decompression, and the lack of any gross movement. But, based on the lack of improvement in her symptoms, Dr. Boyd opined that anterior lumbar interbody fusion with bone dowel surgery would be appropriate, and asked plaintiff to consider the procedure (Tr. 158).

On September 1, 1999, Manhal Wieland, Ph.D., a State agency psychological consultant, completed a psychiatric review technique form, and found that although plaintiff had an affective disorder (depression associated with pain disorder), it was not severe. He found that she only had slight restrictions of daily living activities and difficulties in maintaining social functioning; seldom had deficiencies in concentration, persistence and pace; and did not have episodes of decompensation (Tr. 178-186).

On October 5, 1999, plaintiff was admitted to Lexington Medical Center and James D. Givens, M.D. and Dr. Boyd performed an anterior lumbar discectomy, L4-5 fusion, and bone graft. Postoperatively, plaintiff had good lower extremity power, and was ambulating when discharged on October 9, 1999. Dr. Boyd diagnosed mechanical low back pain. (Tr. 146-150).

On November 9, 1999, plaintiff returned to Dr. Boyd for a followup visit and was "doing quite well"and showed improvement after surgery. On examination, plaintiff had good power throughout, steady gait, and was wearing her back brace (Tr. 156).

On December 9, 1999, plaintiff was in to see Dr. Boyd complaining of recurrent pain and paresthesias in her legs (Tr. 155). Examination showed some baseline weakness in her feet and a guarded gait.

On January 12, 2000, a lumbar spine x-ray showed appropriate disc height, and absence of abnormal movement with flexion and extension (Tr. 160).

On January 17, 2000, James Weston, M.D., a State agency physician, performed a physical residual functional capacity (RFC) assessment, and concluded that plaintiff could perform the exertional demands of a range of light work[2] (Tr. 168-175).

On February 3, 2000, Dr. Boyd noted that plaintiff seemed "a little indifferent about her back and leg pain," and that she was walking with a cane and wearing a back brace. Dr. Boyd found good position of bone dowels with flexion and extension, good early fusion, and the absence of abnormal movement of her bone cages based on X-rays. (Tr. 154).

On February 28, 2000, a CT of the lumbar spine showed post-surgical changes at L4-5, soft tissue density flattening of the thecal sac at L4-5 and narrowing of the neuroforamen, likely representing residual disc bulge and findings of facet arthrosis that contributed to narrowing. A lumbar myelogram showed normal conus, billed nerve roots at each level, and the lack of epidural defects. (Tr. 159).

On March 7, 2000, in a form regarding the functional impact of plaintiff's condition, Dr. Boyd opined that plaintiff experiences pain, spasm, and significant limitation of spinal motion; that emotional factors do contribute to the severity of her limitations; that he has not evaluated what psychological conditions affect her pain; that she is markedly limited in her ability to deal with work stress; and that she would likely be absent from work about three times a month. (Tr. 152-153).

On March 16, 2000, Dr. Boyd opined that plaintiff could do "some type of work," but it needed to be "very light" (Tr. 298).

---

[2]Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. A job falls into this category when it requires a "good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." See 20 C.F.R. § 404.1567(b).

On March 27, 2000, Dr. Boyd noted a very flat affect, some exaggerated point tenderness to palpation of plaintiff's right peri-lumbar area.  He also noted that she was using a cane to walk, and had stuttering weakness in her foot dorsiflexors, which potentially constituted Waddell signs. Based on films, plaintiff showed no abnormal movement upon flexion and extension, her bone graft was incorporated well, she had good decompression of the thecal sac, and her bone dowels were well-placed with good margins (Tr. 151). On October 16, 2000, plaintiff returned to Dr. Boyd with no relief of her symptoms. Dr. Boyd noted the "good solid bony union" shown in her x-rays, stating, "I am at a loss. I have exhausted all reasonable surgical options."  The exam showed a "very flat affect and a somewhat shaky voice," with some giveaway weakness in both legs. Dr. Boyd noted that her condition might be related to some form of peripheral neuropathy and referred her to Dr. Faber for an opinion.

On May 25, 2000, plaintiff presented to Eleanya Ogburu-Ogbonnaya, M.D., for back and leg pain.  Dr. Ogburu-Ogbonnaya noted physical limitations, tingling sensations, joint and muscle problems, difficulty walking, and back pain.  Plaintiff ambulated with a cane, but reported independence in her daily living activities.  Dr. Ogburu-Ogbonnaya found normal cerebellar functioning and gait, diagnosed back pain, post laminectomy syndrome, and extremity numbness, and prescribed pain medications (Tr. 210-212).

On June 7, 2000, plaintiff again saw Dr. Ogburu-Ogbonnaya with complaints of leg weakness, and right arm stiffness.  Plaintiff had full musculoskeletal ranges of motion, normal straight leg raise testing, but decreased strength.  Dr. Ogburu-Ogbonnaya diagnosed carpal tunnel syndrome, and lumbar stenosis, and prescribed Elavil and OxyContin, a narcotic (Tr. 374).

On June 21, 2000, Dr. Ogburu-Ogbonnaya found the absence of gross musculoskeletal

defects, an intact sensory examination, and full motor strength, and continued plaintiff's medications (Tr. 373).

An August 1, 2000, lumbar spine MRI showed post-surgical changes at L4-5 with no evidence of disc herniation or significant compromise of the central canal (Tr. 391).

On October 16, 2000, plaintiff was seen by Dr. Boyd for a followup visit. It was noted that she had failed to improve despite decompression and fusion of her lumbar stenosis and presumed instability at L4-L5 (Tr. 213).

On November 13, 2000, Dr. Ogburu-Ogbonnaya completed an RFC assessment, concluding that plaintiff's pain constantly interfered with her attention and concentration, moderately limited her ability to deal with work stress, and she would miss work more than three times per month. She said that plaintiff could sit, stand, and walk for less than one hour each in an eight-hour workday; use her hands for grasping, pushing, and manipulating; occasionally lift and carry nine pounds, and rarely lift and carry nineteen pounds. She also said plaintiff could never climb; rarely bend, squat, and crawl; and occasionally reach. Plaintiff was totally restricted from heights; moderately restricted from driving; and mildly restricted from being around machinery (Tr. 214-217).

On December 6, 2000, Dr. Ogburu-Ogbonnaya indicated on a questionnaire that she could not completely relieve plaintiff's pain with medications without unacceptable side effects, and plaintiff could only sit, stand, or walk for less than one hour per day. She said that plaintiff could not stand or walk continuously, never lift and carry over 20 pounds, and occasionally lift up to ten pounds. She said that plaintiff's pain only periodically interfered with attention and concentration, and she was "unable to determine" if her impairments would last more than twelve months (Tr. 299-305).

12

On December 18, 2000, Dr. Boyd completed a questionnaire and gave plaintiff a "poor" prognosis and diagnosed lumbar stenosis and mechanical low back pain. Dr. Boyd opined that the symptoms and limitations contained in the questionnaire applied since plaintiff's first visit. Dr. Boyd opined that she could sit for four hours, stand and walk no more than two hours a day, with the need to alternate sitting and standing every ten minutes for up to fifteen minute increments. He said that plaintiff could occasionally lift and carry up to ten pounds. He noted that plaintiff's pain was "out of proportion to the objective physical finds." He opined that plaintiff's pain frequently interfered with attention and concentration; she was capable of low stress jobs; and would miss about three days per month. (Tr. 306-313).

On December 28, 2000, Dr. Ogburu-Ogbonnaya again opined that in addition to those limitations indicated in her December 6th assessment, she was capable of low stress jobs, and would miss work about two to three times per month. She further noted that she was unable to determine if plaintiff's impairments would last for at least twelve months and that emotional factors did not contribute to the severity of plaintiff's symptoms and functional limitations. (Tr. 318-319).

On August 9, 2001, Mitchell Hegquist, M.D., performed a consultative examination of plaintiff. He found that plaintiff could flex 70 degrees at the waist, and bilaterally straight leg raise to 20 degrees, and had normal back curves, extensor hallucis longus strength, neurological functioning, and deep tendon reflexes without muscle spasm or atrophy. He assessed chronic low back pain, and depression associated with chronic pain (Tr. 321-323).

On August 10, 2001, plaintiff was in for a followup visit with Dr. Ogburu-Ogbonnaya with vision changes, and weakness in the lower extremities. Dr. Ogburu-Ogbonnaya found full motor strength on several occasions; diagnosed post-laminectomy pain, ulnar neuropathy, carpal tunnel

13

syndrome, and pain related depression; and administered pain shots (Tr. 355-357).

On August 22, 2001, Richard Weymouth, M.D., another State agency physician, assessed plaintiff's physical RFC based on a review of her medical records.  Dr. Weymouth also found that plaintiff was capable of performing a range of light work (Tr. 325-332).

On October 16, 2001, plaintiff presented to Salish Prabhu, M.D., for consultation.  Dr. Prabhu noted antalgic gait and "boardlike rigidity," but also noted that he was unsure if plaintiff was making adequate effort to flex her lumbar spine.  He found normal sensation; 3/4 right knee and ankle reflexes, and full reflexes on the left side; negative straight leg raising; and inability to do ankle plantar or dorsiflexion, although she could stand on her tiptoes.  Dr. Prabhu noted "a lot of inconsistencies" in plaintiff's examination, and concluded that there were not enough physical findings or the lack thereof to support her amount of pain requiring high dose oral opiates or installation of an intrathecal opiate pump (Tr. 392-393).

Between November 21, 2001, and January 16, 2002, plaintiff's complaints of back and leg pain continued, and Dr. Ogburu-Ogbonnaya found intact senses, and full motor strength and prescribed medications.  On November 21, 2001, plaintiff reported "doing very well" on her medication regime, and on December 19, 2001, plaintiff denied any complications or side effects with her therapy.  On January 16, 2002, Dr. Ogburu-Ogbonnaya told plaintiff to reduce her medications if she experienced hallucinations or increased sedation (Tr. 333-338).

On February 12, 2002, Joyce Lewis, M.D., a State agency physician, affirmed the August 22, 2001, physical RFC assessment of Dr. Weymouth (Tr. 332).

Plaintiff began psychiatric treatment from Dr. Timothy Malone, a psychiatrist, in July of 2002. (Tr. 421-23) On initial evaluation on July 31, 2002, plaintiff reported feelings of helplessness,

14

sleep problems for as long as she can remember, crying spells, and mood swings since her hysterectomy. (Tr. 422), Examination showed thoughts of helplessness and hopelessness, a sad mood, and a blunted affect. Dr. Malone diagnosed Chronic Pain and Major Depressive Disorder without suicidal ideation, and a GAF of 50. (Tr. 423). On follow-up exam on September 30, 2002, Dr. Malone noted a depressed mood, and that she was still having crying spells and problems with pain. Her mood was still sad and her affect blunted. The dosage of Zoloft was increased.

On August 9, 2001, plaintiff was seen for a consultative evaluation by general surgeon Mitchell Hegquist. (Tr. 321-323). Plaintiff reported continued low back pain with associated depression. (Tr. 321). The examination showed lumbosacral and right sciatic tenderness, positive straight leg raising bilaterally at 20 degree, inability to heel-toe walk, limited squatting, and a flat affect. (Tr. 322) X-rays of the lumbosacral spine revealed mild lumbosacral scoliosis, probable facet sclerosis between L4 and the sacrum, several surgical clips in the right upper quadrant, and multiple surgical clips present on the anterior aspect of the lumbosacral spine between L4 and L5. (Tr. 322-323). Dr. Hegquist diagnosed chronic low back pain with extension into the lower extremities, status post lumbosacral surgery, and depression associated with chronic pain. (Tr. 323). He did not assess her residual functional capacity.

## V.  VE TESTIMONY

J. Adger Brown ("VE") appeared and testified at the hearing. (Tr. 59-63). Based on a hypothetical individual of plaintiff's age, education, and past work, limited to performing no lifting or carrying over 20 pounds occasionally, 10 pounds frequently, no pushing or pulling over 20

pounds, no standing and/or walking for six hours, limited in stooping, twisting, crouching, kneeling, and climbing, no balancing or climbing of ladders or scaffolds, and no foot pedals or controls with the lower extremity, she would be able to work as a file and reference clerk, interviewer, sales and counter clerk, and traffic shipping and receiving clerk. (Tr. 59-60). The VE also testified that the individual could perform these jobs with additional restrictions or avoidance of hazards, and work limited to simple routine work. (Tr. 60-61). Based on a similar second hypothetical with an additional limitation of no standing and/or walking over 2 hours, the VE testified that Ms. Spires could work as a food order clerk, interviewer, charge account clerk, and inspector type position. (Tr. 61-62).

When questioned by plaintiff's attorney, the VE testified that based on a hypothetical individual with an inability to sit for more than 1-2 hours at a time, inability to stand or walk for more than 15 minutes at a time, inability to lift and carry more than 5 pounds, the individual would be limited to "a very restricted range of sedentary and unskilled work." (Tr. 62). However, even taking plaintiff's testimony as fully credible pursuant to her attorney's hypothetical, the VE testified plaintiff could perform fifty (50%) percent of the jobs he had listed in response to the judge's hypothetical.

## VI. ARGUMENTS

Plaintiff argues that the ALJ's finding that plaintiff suffers no legally severe mental impairment both lacks the support of substantial evidence and is based on legal error. Plaintiff argues that there exists evidence from every single physician who examined plaintiff that she suffers from

16

significant mental disorders. Plaintiff asserts that:

> While some have endorsed the diagnosis of Depression standing alone (Drs. Ogburu, Malone), others found that her Depression is specifically associated with a pain disorder (Drs. Midcap, Hegquist), while still others have found a psychogenic disorder not otherwise specified, but one which results in the perception or and/or magnification of pained behavior (Drs. Parrott, Prabhu). Of those four doctors who have specifically considered the impact of plaintiff's mental disorder on her ability to function, all have endorsed limitations which would at least equate with an interference in the ability to perform "basic work activities," sufficient to constitute a legally "severe" mental impairment, if not a totally disabling one . . . This total consensus of opinion that plaintiff suffers at least a legally severe mental disorder cannot be ignored: Not a single source who both examined plaintiff and evaluated the issue of plaintiff's mental function found that she was not at least significantly mentally impaired.
>
> Despite this concurrence of opinion, the ALJ found that plaintiff suffers no legally severe mental impairment. His only acknowledgment of the mental impairment evidence consists of an incomplete summary of psychiatrist Malone's findings, having omitted mention of his GAF score and commenting that his records were "illegible in large part." (Tr. 23)

(Memorandum).

Plaintiff argues that by the ALJ finding no severe mental impairment, he set forth his own conclusions with regard to each area of mental function which he found to be no more than mildly impaired, with no citation to any record evidence on those issues. (Tr. 25). Plaintiff contends that the ALJ offered absolutely no analysis of the evidence of mental dysfunction before reaching his conclusions which constitutes error. Plaintiff contends that the ALJ's decision lacks the support of substantial evidence.

Defendant argues in rebuttal that plaintiff failed in her burden of proving that she had a severe mental impairment for the mere existence of a medically determinable impairment does not

make it severe. Defendant argues that the plaintiff did not even allege a mental impairment in her application for DIB and the ALJ was correct in that the medical record did not support a finding that plaintiff had a severe mental impairment. Defendant asserts that the ALJ considered the fact that plaintiff did not start receiving treatment from a mental health professional, Dr. Malone, until July 31, 2002, almost four years after her alleged onset date and a full year-and-a-half after she applied for DIB. (Tr. 23-24, 422-23). Defendant further asserts that plaintiff only saw Dr. Malone two times in a period of over seven months. Defendant argues that the ALJ acknowledged Dr. Malone's treatment notes and plaintiff's own testimony that she took Zoloft which improved her symptoms. (Tr. 23-24, 51-52, 422). Therefore, defendant argues that given the limited frequency of mental health treatment and effectiveness of medications in treating her symptoms, plaintiff failed to show that she had a mental impairment that significantly limited her ability to do basic work activities and her argument must fail.

The opinion of a physician will be given controlling weight if it is supported by medically accepted clinical and laboratory diagnostic techniques and is consistent with the other evidence in the record. 20 C.F.R. § 404.1527(d) (1997); Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (although not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it.); Mitchell v. Schweiker, 699 F.2d 185 (4th Cir. 1983)(a treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time."). Conversely, if a physician's opinion is not supported by medically-accepted clinical and laboratory diagnostic techniques and is not consistent with the other evidence in the record, it will not be given controlling weight. In evaluating how much weight

18

should be given to the opinion of a physician, the nature and extent of the treatment relationship will be taken into account. Id.  An ALJ, therefore, must explain his reasons for disregarding a positive opinion of a treating physician that a claimant is disabled. DeLoatche v. Heckler, 715 F.2d 148 (4th Cir. 1983).

This court is charged with reviewing the case only to determine whether the findings of the Commissioner were based on substantial evidence, Richardson, 402 U.S. at 390.  Even where the plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision, Blalock, 483 F.2d at 775.  The Commissioner is charged with resolving conflicts in the evidence, and this court cannot reverse that decision merely because the evidence would permit a different conclusion. Shively  v. Heckler, 739 F.2d at 989.

The undersigned  finds there is substantial evidence in the medical record to support the ALJ's decision and that the ALJ did not err in the amount of weight he placed on the evidence of the plaintiff's treating and examining physicians. Dr. Ogburu-Ogbonnaya, plaintiff's treating neurologist, opined that plaintiff could do low stress work and Dr. Boyd, plaintiff's treating neurosurgeon, opined that she could perform some type of work, although he suspected it would have to be "very light." (Tr. 298). The ALJ's decision reveals that the ALJ discussed the physician's opinions and reached the following finding with regard to this issue:

> I give little weight to the opinions rendered by Dr. Ogburu-
> Ogbonnaya and Dr. Boyd, which I find are based in large part on the
> claimant's subjective complaints, which are admittedly inconsistent
> with the objective findings

19

On July 31, 2002, the claimant underwent psychiatric evaluation by Dr. Timothy Malone, a psychiatrist. His records are hand-written and illegible in large part, but the claimant reports crying spells ans some sleep disturbance, which, she said is better with anti-depressant medication. She appears sad and reports feelings of helplessness and hopelessness. Dr. Malone diagnosed chronic pain and a major depressive disorder and increase the dosage of her antidepressant medication.

. . . The claimant testified that she takes medication for depression and anxiety caused by being housebound and not being able to work. She said that, with medication, she feels depressed less often.

I have discussed above the medical evidence concerning the claimant's mental disorder and find that the evidence, as considered under sections 12.04 of the Listings, reveals that her depression results in no restrictions of activities of daily living, no more than mild difficulties in maintaining social functioning, and no more than mild difficulties in maintaining concentration, persistence or pace. I find no evidence of repeated episodes of decompensation of extended duration. The overall effect of the claimant's depression does not result in more than minimal limitation of her ability to perform basic work activities, including understanding, remembering, and carrying out instructions; judgments; responding to supervision and coworkers; and dealing with usual work settings and routine changes. Therefore, I find she has no "severe" mental impairment.

(Tr. 21-25).

Based on the above, the undersigned finds that the ALJ fully set forth his reasoning and there is substantial evidence to support the weight he placed on the doctor's statements. It appeared that plaintiff was doing much better on the prescription Zoloft and even though she had some mental impairments, it does not make it a severe impairment. Her own treating specialist stated that she could do low stress work and the other treating neurologist opined that she could do some type of work but very light and may need vocational rehabilitation.

Next, plaintiff asserts the ALJ erred in failing to evaluate the side effects of the prescribed

medication in assessing her residual functional capacity. Defendant contends this is not true and that the ALJ specifically indicated that he was considering the use and effects of medications and acknowledged plaintiff's alleged medication induced memory lapses and occasional inability to form complete sentences. (Tr. 24) Defendant asserts that the ALJ was not required to accept these complaints at face value, and based upon the evidence, found that these complaints were not credible.

First, it must be determined if there was substantial evidence for the ALJ not to find plaintiff's testimony totally credible. In assessing complaints of pain, the ALJ must (1) determine whether there is objective evidence of an impairment which could reasonably be expected to produce the pain alleged by a plaintiff and, if such evidence exists, (2) consider a plaintiff's subjective complaints of pain, along with all of the evidence in the record. See Craig v. Chater, 76 F.3d 585 (4th Cir. 1996); Mickles v. Shalala, 29 F.3d 918 (4th Cir. 1994). A claimant's allegations of pain itself or its severity need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which the impairment can reasonably be expected to cause the pain the claimant alleges she suffers. A claimant's symptoms, including pain, are considered to diminish his or her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4).

As to allegations of pain, the Fourth Circuit has often repeated that, "once objective medical evidence establishes a condition which could reasonably be expected to cause pain of the severity a claimant alleges, those allegations may not be discredited simply because they are not confirmed by objective evidence of the severity of the pain, such as heat, swelling, redness and effusion."

21

<u>Craig</u>, 76 F.3d at 592 (identifying two-step process by which ALJ must first determine if the claimant has demonstrated by objective medical evidence an impairment capable of causing the pain alleged and if so, must then assess the credibility of the claimant's subjective accounts of pain); <u>Jenkins v. Sullivan</u>, 906 F.2d 107, 109 (4th Cir. 1990).

The Commissioner has promulgated Ruling 96-7p to assist ALJs in determining when credibility findings about pain and functional effect must be entered, and what factors are to be weighed in assessing credibility. The Ruling directs that,

> When the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms has been established, the intensity, persistence, and functionally limiting effects of the symptoms must be evaluated to determine the extent to which the symptoms affect the individual's ability to do basic work activities. *This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects . . .*

> An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

> . . .

> The finding on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility. The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision.

Ruling 96-7p (emphasis added).

An ALJ's duty to make credibility findings about the plaintiff's statements about pain in a mental impairment case is just as important as in one alleging a physical impairment. See, e.g., Snell v. Apfel, 177 F.3d 128 (2d Cir. 1999). A reviewing court cannot determine if findings are supported by substantial evidence unless the Commissioner explicitly indicates the weight given to all of the relevant evidence. Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984) (remand required based on failure to indicate weight given to medical reports). The Fourth Circuit has recognized that it is especially critical that the ALJ assess a plaintiff's credibility as to accounts of pain. As the court stated in Hatcher v. Secretary, 898 F.2d 21, 23 (4th Cir. 1989) (citations omitted):

> [i]t is well settled that: '[t]he ALJ is required to make credibility determinations--and therefore sometimes make negative determinations--about allegations of pain or other nonexertional disabilities . . . . But such decisions should refer specifically to the evidence informing the ALJ's conclusion. This duty of explanation is always an important aspect of the administrative charge, . . . and it is especially crucial in evaluating pain, in part because the judgment is often a difficult one, and in part because the ALJ is somewhat constricted in choosing a decisional process.

The ALJ stated in his decision that the claimant testified that side-effects from pain medication include memory lapses and an inability, at times, to form complete sentences. The claimant testified that she takes medication for depression and anxiety caused by being housebound and not being able to work. She said that, with medication, she feels depressed less often. Further, the ALJ cited numerous reasons for finding that plaintiff's credibility was not without question. For instance, the ALJ concluded that:

> Considering the claimant's activities; the lack of emergency room visits or frequent hospitalizations for pain, the lack of alternative treatment modalities for pain in more than three years, other than medication, including narcotic medication; statements by numerous examining and treating physicians that the claimant's pain complaints

23

and behavior are inconsistent with objective findings; the absence of any mental health counseling, only medication; and the opinions of Drs. Boyd and Ogburu-Ogbonnaya notwithstanding, I do not find the allegations of disabling pain and limited functional capacity to be credible. The evidence does not show strength deficits, circulatory compromise, neurological deficits, fasciculations, fibrillations or muscle atrophy or dystrophy that are often associated with long-standing, severe or intense pain and physical inactivity.

(Tr. 24).

There is substantial evidence to support the ALJ's decision as to plaintiff's allegations as to her mental impairments and the affect of the medication. Plaintiff did not complain of side effects from her pain medication to the extent that it affected her daily activities and reported to her treating neurologist that her medications allowed her to increase her activities. (Tr. 361). Plaintiff reported that Kadian provided her pain relief without intolerable side effects, she had reported that she was doing well on her medication and denied any complications or side effects with her therapy. (Tr. 335, 337, 358). The ALJ properly considered the inconsistencies between plaintiff's testimony and other evidence of record in evaluating her credibility of her subjective complaints.

Based on the above, the ALJ's evaluation of plaintiff's subjective complaints complies with the Fourth Circuit precedent and the Commissioner's regulations. The ALJ adequately addressed each complaint, as discussed, and explained his evaluation. Therefore, the undersigned concludes that there is substantial evidence to support the ALJ's determination as to plaintiff's complaints of pain and her credibility based on the objective medical evidence. While the plaintiff may have limitations, there is substantial evidence to support the ALJ's decision that they are not so severe as to preclude her from the demands of all work.

## VII.  CONCLUSION

Despite the plaintiff's claims, she has failed to show that the Commissioner's decision was not based on substantial evidence. Based upon the foregoing, this court concludes that the ALJ's findings are supported by substantial evidence and recommends the decision of the Commissioner be affirmed. Therefore, it is

RECOMMENDED that the Commissioner's decision be AFFIRMED and that plaintiff's motion for judgement on the pleadings be DENIED.

Respectfully submitted,

s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

February 3, 2006
Florence, South Carolina

**The parties' attention is directed to the important notice on the next page.**

### Notice of Right to File Objections to Magistrate Judge's "Report and Recommendation"
### &
### The Serious Consequences of a Failure to Do So

The parties are hereby notified that any objections to the attached Report and Recommendation (or Order and Recommendation) must be filed within ten (10) days of the date of service. 28 U.S.C. § 636 and Fed. R. Civ. P. 72(b). The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three days for filing by mail. Fed. R. Civ. P. 6. A magistrate judge makes only a recommendation, and the authority to make a final determination in this case rests with the United States District Judge. *See* Mathews v. Weber, 423 U.S. 261, 270-271 (1976); and Estrada v. Witkowski, 816 F. Supp. 408, 410, 1993 U.S.Dist. LEXIS® 3411 (D.S.C. 1993).

During the ten-day period for filing objections, but not thereafter, a party must file with the Clerk of Court specific, written objections to the Report and Recommendation, if he or she wishes the United States District Judge to consider any objections. Any written objections must *specifically identify* the portions of the Report and Recommendation to which objections are made *and* the basis for such objections. *See* Keeler v. Pea, 782 F. Supp. 42, 43-44, 1992 U.S.Dist. LEXIS® 8250 (D.S.C. 1992); and Oliverson v. West Valley City, 875 F. Supp. 1465, 1467, 1995 U.S.Dist. LEXIS® 776 (D.Utah 1995). Failure to file written objections shall constitute a waiver of a party's right to further judicial review, including appellate review, if the recommendation is accepted by the United States District Judge. *See* United States v. Schronce, 727 F.2d 91, 94 & n. 4 (4th Cir.), *cert. denied*, Schronce v. United States, 467 U.S. 1208 (1984); and Wright v. Collins, 766 F.2d 841, 845-847 & nn. 1-3 (4th Cir. 1985). Moreover, if a party files specific objections to a portion of a magistrate judge's Report and Recommendation, but does not file specific objections to other portions of the Report and Recommendation, that party waives appellate review of the portions of the magistrate judge's Report and Recommendation to which he or she did not object. In other words, a party's failure to object to one issue in a magistrate judge's Report and Recommendation precludes that party from subsequently raising that issue on appeal, even if objections are filed on other issues. Howard v. Secretary of HHS, 932 F.2d 505, 508-509, 1991 U.S.App. LEXIS® 8487 (6th Cir. 1991). *See also* Praylow v. Martin, 761 F.2d 179, 180 n. 1 (4th Cir.)(party precluded from raising on appeal factual issue to which it did not object in the district court), *cert. denied*, 474 U.S. 1009 (1985). In Howard, supra, the Court stated that general, non-specific objections are *not* sufficient:

A general objection to the entirety of the [magistrate judge's] report has the same effects as would a failure to object. The district court's attention is not focused on any specific issues for review, thereby making the initial reference to the [magistrate judge] useless. * * * This duplication of time and effort wastes judicial resources rather than saving them, and runs contrary to the purposes of the Magistrates Act. * * * We would hardly countenance an appellant's brief simply objecting to the district court's determination without explaining the source of the error.

*Accord* Lockert v. Faulkner, 843 F.2d 1015, 1017-1019 (7th Cir. 1988), where the Court held that the appellant, who proceeded *pro se* in the district court, was barred from raising issues on appeal that he did not specifically raise in his objections to the district court:

Just as a complaint stating only 'I complain' states no claim, an objection stating only 'I object' preserves no issue for review. * * * A district judge should not have to guess what arguments an objecting party depends on when reviewing a [magistrate judge's] report.

*See also* Branch v. Martin, 886 F.2d 1043, 1046, 1989 U.S.App. LEXIS® 15,084 (8th Cir. 1989)("no de novo review if objections are untimely or general"), which involved a *pro se* litigant; and Goney v. Clark, 749 F.2d 5, 7 n. 1 (3rd Cir. 1984)("plaintiff's objections lacked the specificity to trigger *de novo* review"). This notice, hereby, apprises the plaintiff of the consequences of a failure to file specific, written objections. *See* Wright v. Collins, supra; and Small v. Secretary of HHS, 892 F.2d 15, 16, 1989 U.S.App. LEXIS® 19,302 (2nd Cir. 1989). Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing objections addressed as follows:

Larry W. Propes, Clerk
United States District Court
Post Office Box 2317
Florence, South Carolina  29503